# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>413 E. 5th Street, Apartment 2, Long Beach, California ("SUBJECT PREMISES") | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  19 MJ 4818

FILED
CLERK, U.S. DISTRICT COURT

NOV 1 3 2019

CENTRAL DISTRICT OF CALIFORNIA

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-3*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B-2*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), 846;<br>18 U.S.C. § 1956 | Possession with the intent to distribute and distribution of controlled substances, and conspiracy to do the same; Unlawful use of a communications facility; Money laundering and conspiracy to launder monetary instruments |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/

*Applicant's signature*

SA Angelica Childs

*Printed name and title*

Sworn to before me and signed in my presence.

Date:  11/13/19

City and state:  Los Angeles, CA

**ALKA SAGAR**

*Judge's signature*

Honorable Alka Sagar

*Printed name and title*

AUSA: Bryant Yang x0166

## ATTACHMENT A-3

PREMISES TO BE SEARCHED

The premises located at 413 E. 5th Street, Apartment 2, Long Beach, California ("SUBJECT PREMISES"), is an apartment in a two-story, multi-family building, with metal and brick fencing. It is a residential address.  The number 413 is visible above the main entrance.  The search shall include any and all attachments, attics, basements, garages, safes, carports, parking spots, outbuildings, storage units, appurtenances thereto, and all other areas associated with or assigned to the SUBJECT PREMISES.  The search shall also include all vehicles and digital devices found on or at areas associated with the SUBJECT PREMISES.

**ATTACHMENT B-2**

## I.  ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 846 (possession with intent to distribute controlled substances, distribution of controlled substances, and conspiracy to do the same); 21 U.S.C. § 843(b) (unlawful use of a communications facility to facilitate drug trafficking offenses); and 18 U.S.C. § 1956 (money laundering and conspiracy to launder monetary instruments) (the "Subject Offenses"), namely:

a.    Any controlled substance, controlled substance analogue, or listed chemical;

b.    Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.    Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records,

documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e.    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

f.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

g.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

ii

h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

i.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

j.   Contents of any calendar or date book;

k.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

l.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

m.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.   evidence of the times the device was used;

      vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

      vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      viii.    records of or information about Internet Protocol addresses used by the device;

      ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

    4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

        a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall

complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device

pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Angelica Childs, being duly sworn, declare and state as follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES") seized on November 13, 2019, from JOEL RAMON HERRERA MARTINEZ, in the custody of the Drug Enforcement Administration, in Los Angeles County, California, as described more fully in Attachment A-1:

      a.   A black Alcatel flip-cellphone; and

      b.   A black Samsung cellphone.

2.   This affidavit is also made in support of an application for a warrant to search a 2012 silver/gray Toyota Corolla, bearing license plate number 7DYB729 (the "SUBJECT VEHICLE") as described more fully in Attachment A-2.

3.   This affidavit is also made in support of an application for a warrant to search the residential premises located at 413 E. 5th Street, Apartment 2, Long Beach, California ("SUBJECT PREMISES"), as described more fully in Attachment A-3.

4.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 846 (possession with intent to distribute controlled substances, distribution of controlled substances, and conspiracy to do the same); 21 U.S.C. § 843(b) (unlawful use of a communications facility to facilitate drug trafficking offenses); and 18 U.S.C. § 1956 (money laundering and conspiracy

to launder monetary instruments) (the "Subject Offenses"), as described more fully in Attachments B-1 and B-2.  Attachments A-1, A-2, A-3, B-1, and B-2 are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

6.    I am an investigator and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7).  I am empowered by law to conduct investigations of, and make arrests for, the federal felony offenses enumerated in Title 18, United States Code, Section 2516.

7.    I have been employed as a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") since August of 2019, and currently am assigned to the DEA Los Angeles Field Division ("LAFD") Group 1.  I received and completed formal training that included a 16-week DEA training program in Quantico, Virginia. I have specialized training and experience in the investigation of major narcotics trafficking organizations involved in violent

crimes, racketeering, conspiracy crimes, and narcotics importation and distribution.  I have participated in the debriefing of defendants and informants who had personal knowledge regarding major narcotics trafficking organizations. Additionally, I have participated in many aspects of drug investigations, such as extensive hours of conducting surveillance.  I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering.

8.   I am also familiar with the sophisticated methods that drug organizations use to avoid detection by law enforcement, such as the use of multiple cellphones, pre-paid calling cards, counter-surveillance measures, established relationships with legitimate businesses to hide drugs and launder drug proceeds, vehicles with concealed compartments, false or fictitious identities, and coded and/or vague communications and conversations over cellphones, including text messages.

### III. SUMMARY OF PROBABLE CAUSE

9.   ON NOVEMBER 13, 2019, JOEL RAMON HERRERA MARTINEZ ("HERRERA") supplied two Confidential Informants ("CS-1"[1] and

---

[1] For about a year or two, CS-1 has been cooperating with LA Impact.  CS-1 has previously provided information that has been corroborated and proven to be reliable.  CS-1 has worked on multiple cases and his cooperation has led to numerous seizure. Based on CS-1's criminal check, he does not have a criminal history.  He may have been arrested for a narcotic-related offense, but he was never formally booked, charged, or

"CS-2"[2]) with one pound of suspected methamphetamine and about 100 suspected fentanyl pills in exchange for $1,900.  HERRERA traveled to and from the meeting location in the SUBJECT VEHICLE (a 2012 silver/gray Toyota Corolla, bearing license plate number 7DYB729).

10.   Later, HERRERA called CS-1 to update the CSs about the amount of drugs he had at his residence (SUBJECT PREMISES). HERRERA said that he had at the SUBJECT PREMISES 29 pounds of methamphetamine, 5,000 pills, 1 kilogram of China-white heroin, and 2 kilograms of black heroin.  HERRERA offered to sell the drugs to the CSs.

11.   HERRERA then called CS-1 to inform CS-1 that he was on his way with the drugs.  An air surveillance team saw HERRERA place three boxes into the SUBJECT VEHICLE.  At around 4:36 p.m., members from LA Impact conducted a traffic stop of the SUBJECT VEHICLE.

## IV. **STATEMENT OF PROBABLE CAUSE**

12.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

---

convicted.  In a trial in Maricopa County, Arizona, CS-1 answered, "No," when asked whether s/he lived at an address and whether his/her children went to a specific school out of fear for the safety of his/her family.  CS-1 is cooperating for monetary consideration.

[2] CS-2 has previously provided information to the DEA that has been corroborated and proven to be reliable.  CS-2 has two prior arrests: a 2008 arrest for assault with a deadly weapon and a 2016 arrest for possession of a controlled substance for sale.  CS-2 is cooperating for charging and sentencing consideration related to the seizure of 3 kilograms of cocaine and 1 pound of methamphetamine.

**A.    Investigative Overlap Between Los Angeles DEA Group 1
and Los Angeles IMPACT Investigations Involving
HERRERA**

a.   On or about September 25, 2019, the Honorable S.
James Otero, United States District Court Judge for the Central
District of California, authorized the interception of wire
communications over telephone number (424) 223-8247, used by
Brian MIRANDA ("MIRANDA").  On or about October 24, 2019, at
approximately 8:52 p.m., MIRANDA, using (424) 223-8247, called
(562) 826-1680 ("HERRERA'S CELLPHONE").  The following is a
summary of the telephone call which was translated to English
from Spanish by linguists:[3]

>MIRANDA:  Hello.  Hey, I'm calling on behalf of Cunado
>(brother in law).
>
>HERRERA:  Yeah, what's up, buddy?
>
>MIRANDA:  How are you?  Yeah, I want to give you the
>address.  I don't know if he mentioned how many there were
>going to be.
>
>HERRERA:  Yes, he sent me an address.  Is it the same one
>he sent me?
>
>MIRANDA:  Yes, yes, yes.  I'll be heading that way now.
>Let me know when you get there, okay?  I'll be heading that
>way.
>
>HERRERA:  Okay, I'll let you know.  I'm in Long Beach.
>
>MIRANDA:  Yeah, not a problem.  Just let me know how long
>it's going to take you to get there.
>
>HERRERA:  Okay, I'll call you as soon as I leave this area.
>
>MIRANDA:  Okay, send me a message.

---

[3] The draft transcriptions and translations of these calls
included herein in this application are preliminary and subject
to change upon final review.

HERRERA:   I'm getting ready, okay?   Bye.

b.    Based on my training, experience, and knowledge of this investigation, I believe that drug traffickers use coded terms and language in order to mask their illegal activities and thwart law enforcement.   In this instance, I believe that MIRANDA called HERRERA and told HERRERA that he was not law enforcement and was being referred by another individual ("Hey, I'm calling on behalf of 'Cunado' (brother-in-law)").   Later, based on my training, experience, and knowledge of this investigation, I believe that MIRANDA and HERRERA confirmed the specific quantity of controlled substances agreed upon by another individual ("Cunado"), with whom MIRANDA had spoken to prior to this communication ("I don't know if he mentioned how many there were going to be." "Yes, he sent me an address.").[4]   I know drug distributors often work in concert with each other supplying and selling controlled substances and, in this instance, I believe that HERRERA was sourcing MIRANDA with a particular controlled substance assisted by another unknown individual in the criminal organization.

c.    On or about November 7, 2019, based on an investigative overlap, SA Gamez spoke with LA IMPACT Detective Christopher Regan, who told me that CS-1 was in contact with HERRERA, who was using HERRERA'S CELLPHONE.   Per Detective

---

[4] Investigators did not intercept communication from MIRANDA to another individual before or prior to this communication. Based on my training, experience, and knowledge of this investigation I believe MIRANDA uses text messaging, WhatsApp and SnapChat to also conduct drug trafficking activities.

Regan, HERRERA is a drug source of supply who could supply
multi-pound amounts of methamphetamine and thousands of
fentanyl-laced pills.

**B.    HERRERA Agreed to Sell CS-1 79 Pounds of
        Methamphetamine and 25,000 Fentanyl Pills**

        d.    On or about November 7, 2019, CS-1 spoke with
HERRERA and asked to purchase methamphetamine and pills.  The
following is a summary of the telephone call, which was
translated to English from Spanish:  Initially, CS-1 said that
s/he was looking for "windows" and "buttons," but s/he was
unable to find them so s/he bought something else.  CS-1 told
HERRERA that s/he would return to the area the following
Tuesday.  S/he suggested that they both meet the following day
and s/he "could buy the windows and buttons, like they had
previously agreed."  HERRERA replied, "Any way you, any way you
want, buddy.  I'm willing, no problem, you know that."  CS-1
then reminded HERRERA that he dealt with large quantities.
HERRERA replied, "I work with big numbers too, don't worry.  You
just tell me, and…very quickly."  CS-1 then told HERRERA, "For
next Wednesday, I'm going to need 79 windows and 25 whole
buttons, 25,000 buttons.  If you think you can for next
Wednesday, let me know.  If not, then I can look elsewhere."
HERRERA replied that he would make calls so he "could have, for
[CS-1], his order, exactly what [CS-1] want[ed] for that day.
What do you think?"

        e.    Based on my training, experience, and knowledge
of this investigation, I believe that CS-1 ordered 79 pounds of

methamphetamine and 25,000 fentanyl pills ("For next Wednesday, I'm going to need 79 windows and 25 whole buttons, 25,000 buttons."). I also believe that HERRERA said that he could supply CS-1 with the requested drugs ("exactly what [CS-1] want[ed] for that day").

**C.   Identification of Joel Ramon HERRERA MARTINEZ**

f.   On or about November 8, 2019, the Honorable Rozella Oliver, United States Magistrate Court Judge for the Central District of California, issued warrant 19-MJ-04756, which allowed the disclosure of cell site information and GPS data for HERRERA'S CELLPHONE and the use of a cell-site simulator. On November 12, 2019, Fontana Police Department Detective Kyle Guthrie used a cell-site simulator to locate HERRERA'S CELLPHONE in the vicinity of an apartment complex located at 413 E. 5th Street, Long Beach, California.

g.   Around the same date, CS-1 provided a Whatsapp photograph of the user of HERRERA'S CELLPHONE to Los Angeles IMPACT Detective Christopher Regan. Detective Regan had LA IMPACT Detective Nick Butler run the image through a facial recognition software, which identified the individual as Joel Ramon HERRERA MARTINEZ. A search of a law enforcement database showed that Joel HERRERA has previously used 413 E. 5th Avenue, Apartment 2, Long Beach, California (SUBJECT PREMISES), as a home address.

### D. On November 13, 2019, HERRERA Sold CS-1 and CS-2 One Pound of Methamphetamine and 100 Fentanyl Pills

h. On or about November 13, 2019, at approximately 11:25 a.m., SAs Gamez and Andrew Davis met with CS-1 and CS-2 regarding the potential drug deal. At approximately 12:00 p.m., CS-1 received a telephone call from HERRERA, who was using (562) 616-3612 ("HERRERA's SECOND CELLPHONE"). HERRERA said that he was ready to sell him/her the drugs.

i. At around 1:47 p.m., HERRERA arrived at the Target Store in Signal Hill, California, driving the SUBJECT VEHICLE (a 2012 silver/gray Toyota Corolla, bearing license plate number 7DYB729). Detective Byrd then saw HERRERA get out of the SUBJECT VEHICLE and get into the front passenger's seat of the CS-1's vehicle. Based on a contemporaneous recording, which was translated by SA Jesus Gamez, HERRERA received a telephone call, while in CS-1's vehicle. The caller told HERRERA that China-white heroin is going for $24,000 a kilogram.

j. Thereafter, HERRERA got into the SUBJECT VEHICLE and drove to the SUBJECT PREMISES (his residence at 413 East 5th Street, Long Beach, California). CS-1 and CS-2 left the Target Store in Signal Hill and traveled to a neutral location, where they and their car was searched by DEA agents. The agents found about one pound of suspected methamphetamine wrapped in a clear plastic bag and about 100 suspected fentanyl pills in a separate plastic bag. Both bags of drugs were in a potatoes chip bag in the rear passenger's seat.

k.    SA Gamez debriefed the CSs.  CS-1 said that
HERRERA was carrying a shoulder bag when HERRERA got into the
car.  According to CS-1, HERRERA took out the potatoes chip bag
and told the CSs to look inside.  CS-1 looked inside and saw the
drugs.  The CSs provided HERRERA with $1,900.  HERRERA said that
he did not have the full order at the time, but that he could
make some calls and get the order together.  HERRERA said that
he would need two to three hours to get the amount of drugs
ready.  HERRERA then started to make telephone calls to various
sources.  HERRERA told the CSs that he had at his residence 2
kilograms of black heroin, 1 kilogram of China white heroin,
more than 30 pounds of methamphetamine, and 4,000 pills.
HERRERA said that he would send the CSs pictures of the drugs he
had at home.

l.    At around 3:00 p.m., HERRERA called CS-1 again,
but using a different telephone number.  HERRERA called to
update the CSs about the amount of drugs he had.  HERRERA said
that he had at his residence 29 pounds of methamphetamine, 5,000
pills, 1 kilogram of China-white heroin, and 2 kilograms of
black heroin.  HERRERA said that he would not be able to get
more drugs as he previously agreed.  HERRERA asked if the CSs
still wanted to purchase the drugs he did have available.  CS-1
said he remained interested in buying the drugs.  HERRERA
replied that he will bring the drugs after he drops of his wife
at work.

m.    HERRERA then called CS-1 to inform CS-1 that he
was on his way with the drugs.  An air surveillance team saw

10

HERRERA place three boxes into the SUBJECT VEHICLE.  At around
4:36 p.m., members from LA Impact conducted a traffic stop of
the SUBJECT VEHICLE and searched the vehicle.  Law enforcement
seized the DIGITAL DEVICES from HERRERA during the traffic stop.

### V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

13.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where drug traffickers have ready access to them, such as on
their cell phones and other digital devices, and in their
residences.

c.   Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This

includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital

scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[5]

14.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally,

---

[5] As used herein, the term "digital device" includes the SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

15.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises or in a short period of time for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## A.    Night Service

16.    Based on my training, experience, and knowledge of this investigation, I know that investigators need to execute search warrants immediately or soon after a seizure.  If investigators wait to execute a search warrant, it will very likely compromise the investigation and could put the agents and others at risk.  Based on my training and experience, I also know that law enforcement agents require time to efficiently and effectively execute search warrants on digital devices, premises, and vehicles.  As explained above, members from LA Impact conducted a traffic stop of the SUBJECT VEHICLE at around 4:36 p.m.  Therefore, I request night service authorization in order to execute the search warrants, which will protect the integrity of the investigation and better ensure the safety of law enforcement officers.

///

///

///

## VII. **CONCLUSION**

17.   For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B-1 will be found in a search of the SUBJECT DEVICES described in Attachment A-1, and that the items to be seized described in Attachment B-2 will be found in a search of the SUBJECT VEHICLE described in Attachment A-2 and the SUBJECT PREMISES described in Attachment A-3.

_____
ANGELICA CHILDS, Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me
this 13th day of November, 2019.

**ALKA SAGAR**
_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE